IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 11, 2013 Session

## JAMES ALLEN AUSTIN v. MARELY TORRES

**Appeal from the Circuit Court for Davidson County**
**No. 11D3097      Carol Soloman, Judge**

---

**No. M2012-01219-COA-R3-CV - Filed March 20, 2014**

---

The divorced father of an seven year old child filed a petition to transfer custody of the child from the mother to himself. The trial court heard expert proof that the child suffered from a rare genetic disorder that can cause grave neurological consequences if the child's diet is not strictly controlled. The mother's testimony indicated that she was unconvinced that the child had a disorder and that she was unwilling to adjust the child's diet to meet his medical needs. The court found that there had been a material change of circumstances and that it was in the best interest of the child that custody be transferred to the father, with the mother's visitation limited to fifty days per year. The mother argues on appeal that the trial court's order should be reversed because it committed a number of procedural errors in the course of the custody proceedings. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, joined.

Tusca R.S. Alexis, Nashville, Tennessee, for the appellant, Marely Torres.

C. Diane Crosier, Franklin, Tennessee, for the appellee, James Allen Austin.

### OPINION

### I. BACKGROUND

The child at the center of this case, James Austin, Jr., was born in 2004 to James Austin, Sr. (Father) and Marely Torres (Mother). Shortly after his birth, the child was diagnosed with a rare genetic disorder called Phenylketonuria or PKU, in which the body cannot break down an amino acid called phenylalanine (Phe). If Phe builds up in the blood,

it can lead to mental retardation, seizures and other serious medical problems. Phe is found in many foods that are rich in protein, such as meat, eggs, and dairy products. In order to prevent neurological damage, the diet of a PKU sufferer must therefore be strictly controlled.

On November 20, 2008, Father was awarded a divorce from Mother on the ground of irreconcilable differences. Under their Marital Dissolution Agreement and their Agreed Parenting Plan, Mother was designated as the child's Primary Residential Parent, but parenting time was divided equally between the parties, with each to exercise 182.5 days of parenting per year. Father was ordered to pay child support of $60.46 per week in accordance with the guidelines as well as health and dental insurance for the child.

Major decisions involving the child's non-emergency healthcare, his religious upbringing and extracurricular activities were to be jointly made, but Father was given primary responsibility over educational decisions, with the proviso that "[e]ducational decisions shall be jointly discussed, but Father shall make the ultimate decision." Among the "special provisions" included in the parenting plan were that

1). Both parents shall record the child's food intake in one document that shall be exchanged when the child is exchanged.
2). The child's diet shall be in accordance with the child's current medical condition.

The plan also included a provision that the parties would make a good faith effort to settle disagreements or modification through "mediation by a neutral party chosen by the parents or the Court."

On September 29, 2011, Father filed a petition in the Rutherford County Chancery Court seeking a modification of the parenting plan. He proposed a new parenting plan under which he would be designated as the child's Primary Residential Parent, and his parenting time would be increased to 265 days per year. Father alleged that Mother was violating the existing parenting plan in numerous ways, including by giving the child food that was inconsistent with his medically-prescribed diet. Father also alleged that Mother did not provide him with an accurate record of the child's food intake.

The case was subsequently transferred to the Davidson County Circuit Court. Mother's answer and counterpetition was filed in that court on December 21, 2011. She denied Father's allegations, asserted that Father had transferred the child from a school near her home without consulting with her, and she asked the court to order the parties to share joint decision-making about the child's education. On March 28, 2012, the parties entered into a pre-trial stipulation that acknowledged that the child had PKU, that the condition can

lead to brain damage unless a Phe-restricted diet is followed, and that "[m]ost experts suggest that a Phe-restricted diet should be lifelong."

## II. TRIAL PROCEEDINGS

On April 3, 2012, the trial court conducted a hearing on Father's petition and Mother's counterpetition. Aside from the parties, the testifying witnesses included a nurse practitioner who testified about the child's condition and a nutritionist who has worked with the child since he was two weeks old, when it was discovered that he had PKU.[1]

The nurse practitioner testified that because of the child's genetic condition, failure to closely monitor his intake of Phe can cause severe brain damage and other neurological effects over time. She also testified that Mother has been unable to properly regulate the child's diet and that Mother does not understand the disease and the importance of maintaining a proper diet for the child. She acknowledged that the child has not shown any side effects from his diet, but asserted that such effects do not appear for some time.

The nutritionist testified that she had met with Mother on numerous occasions to teach her how to keep the food records, but that she was unsuccessful because Mother did not believe that the child had PKU or that if she prays the child will not have PKU. She further testified that Mother often gives the child foods that he should not be eating because they are high in Phe. Father has always provided accurate food records for the child, and the child's Phe levels were always better after an extended stay with Father.

Father testified about his own efforts to teach Mother how to maintain the child's food records. He also testified that because the child appears to be healthy, Mother does not believe that he has a medical condition and that she has told him that eating certain Phe-rich foods "won't kill him." He further stated that Mother is unable to help the child with his school work and other school-related matters because of the language barrier.[2]

Mother admitted that the nutritionist had spent time with her on numerous occasions to teach her how to keep the child's food records, but on cross-examination she could not identify the problems with her own food records. She also admitted that she had been

---

[1]No transcript of the hearing was prepared, so our account of the events at trial derived from the Statement of the Evidence, which was entered into the appellate record in accordance with Tenn. R. App. P. 24(c).

[2]Mother is a native of El Salvador. She testified with the assistance of a Spanish language interpreter during the trial of this case.

arrested for domestic assault and that her drivers license had been suspended.

The trial court entered an order in this case on May 3, 2012. The court stated that "Mother has not been a truthful witness," and further, that she had failed to properly maintain and exchange the food records of the child "which makes the Court very concerned for the child's health and well-being." The court concluded that this failure constituted a material change of circumstances that warranted a modification of the parenting plan.

The court accordingly designated Father as the child's Primary Residential Parent and adopted a new Parenting Plan that limited Mother's parenting time to fifty days per year. Father's child support obligation was terminated, and Mother was ordered to pay child support to Father of $370 per month in accordance with the child support guidelines. Mother's compliance with the child's dietary needs going forward was set for review in June, with the possibility of either a suspension or an expansion of Mother's visitation possible, depending on the result of the review. Mother's counterpetition was dismissed. This appeal followed.

### III. ANALYSIS

#### A. The Question of Mediation

Mother's first argument on appeal is that the trial court erred in failing to order the parties to mediate before conducting the final hearing on Father's petition to modify the parenting plan. She notes that the original parenting plan specifically called for such mediation, and she asserts that no such mediation occurred in this case.

Father replies that the parties did attend mediation just prior to the filing of his petition. The appellate record includes a mediator's final report that indicates that a mediation was conducted on September 20, 2011, that both parties appeared and participated in the mediation, that both parties were represented by their attorneys, and that the case did not settle.

Mother asserts, however, that the subject of that mediation was not a modification of the parenting plan, but rather Father's decision to change the child's school. Mother's current attorney has supplemented the record with a copy of a letter sent by her prior attorney to Father on August 16, 2011, asking Father to participate in mediation over a question of scheduling and the decision to change schools. We are not convinced that the trial court was required to read that letter as establishing the limitation of the mediation.

In any event, Mother has not presented any evidence that her attorneys asked the trial

-4-

court to stay the hearing on Father's modification petition pending the conduct of mediation on the questions raised in that petition, or that they brought the issue of mediation to the attention of the trial court in any other way. In the absence of any such evidence, we cannot fault the trial court for failing to order the parties to go to mediation.

### B. The Modification of the Parenting Plan

Mother challenges the trial court's determination that a material change in circumstances had occurred that would warrant naming Father as the Primary Residential Parent and limiting her parenting time to only fifty days a year. She also challenges the manner in which the court made that determination.

A decision on a request for modification of a parenting arrangement generally requires a two-step analysis. *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred, and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick v. Shoemake,* 90 S.W.3d 566, 575 (Tenn. 2002). A material change of circumstances does not require a showing of a substantial risk of harm to the child. Tenn. Code Ann. § 36-6-101(a)(2)(B). It does not take a leap of logic, however, to conclude that the emergence of such a risk can constitute a material change of circumstances.

Under prior court decisions, a party alleging, for the purpose of modifying an existing parenting arrangement, that there had been a material change of circumstances, was required to prove that the alleged change could not reasonably have been anticipated when the initial residential parenting schedule was established. In 2004, our legislature addressed the concept of a material change of circumstances and added language to the existing statutes as follows:

> A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tennessee Code Annotated § 36–6–101(a)(2)(C).

Our Supreme Court recently revisited the question of whether a change of

-5-

circumstances could justify a modification of a parenting plan, even when the change was one that could have been anticipated at the time the initial parenting plan was established. The court held that it could, in light of Tenn. Code Ann. § 36-6-101(a)(2)(C). *Armbrister v. Armbrister,* E2012-00018-SC-R11-CV, 2013 WL 5688775 (Tenn. Oct. 21, 2013).

In the present case, the trial court heard expert proof that the child suffers from a rare genetic condition that can lead to mental retardation and other neurological effects if his diet is not carefully controlled. Because of the child's condition, the parenting plan required that both parents provide him with a diet appropriate for his condition. The proof showed, however, that Mother did not believe that there was anything wrong with the child, and that during the time he was in her care, she was unable or unwilling to conform his diet to his medical requirements or to accurately record his dietary intake, thereby failing to adhere to the parenting plan and exposing him to an unacceptable risk of harm.

Proof was also presented that Father was aware of the danger and that he was careful to monitor and record the child's diet and to regulate his intake of the substance that causes the risk. We do not doubt that Mother loves her child or that she wants the best for him, but she appears unable to routinely follow the restricted diet that his medical condition requires.

No countervailing evidence was presented at trial to refute the expert testimony about the dangers to the child arising from eating the wrong food. The trial court heard the testimony of the witnesses directly and was able to observe their demeanor and to assess their credibility, and it concluded on the basis of that testimony that Mother's response to her child's medical/nutritional needs was a material change of circumstances that affected the well-being of the child in a meaningful way. We affirm the trial court's conclusion.

Mother also argues that the court failed to take the necessary second step in deciding a petition for modification of a parenting plan, because it did not make a specific determination that a change in the parenting plan was in the child's best interest, in accordance with the factors set out at Tenn. Code Ann. § 36-6-404(b). It is true that the trial court did not use the words "best interest" in its final order and that it did not refer to the statutory factors. However, since the trial court found that the change in circumstances that affected the child's well being was Mother's failure to follow the restrictions on diet that affected the child's health, it is clear to us that the same factual finding is the basis for the court's inherent conclusion that it was in the child's best interest that Father be designated as his Primary Residential Parent. *See Graham v. Graham,* No. 03A01–9412–CV–00448, 1995 WL 447785 at *1 (Tenn. Ct. App. July 31, 1995).

While the trial court is obligated to consider all relevant factors in reaching its decision, it is not required to list each of those factors in its opinions or orders, nor is it

required to explain how each factor affected its overall determination. *Woods v. Tidwell*, M2009-01972-COA-R3-CV, 2011 WL 1662900 (Tenn. Ct. App. May 3, 2011) (no Tenn. R. App. P. 11 application filed); *Woods v. Woods*, M2006-01000-COA-R3-CV, 2007 WL 2198110, at *2 (Tenn. Ct. App. Jul. 26, 2007) (no Tenn. R. App. P. 11 application filed); *Matlock v. Matlock*, M2004-01379-COA-R3-CV, 2007 WL 1452691, at *5 (Tenn. Ct. App. May 16, 2007) (no Tenn. R. App. P. 11 application filed).

Where the trial court fails to make specific factual findings, we must conduct our own independent review of the record to determine where the preponderance of the evidence lies. *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006). There is very little evidence to be found in the record of this case that is relevant to most of the factors set out at Tenn. Code Ann. § 36-6-404(b). The pivotal factor for determining the best interest of the child in this case is the same as was used to determine that a material change of circumstances had occurred – the danger the child was exposed to from Mother's inability or unwillingness to control his diet with a proper regard for the severe medical consequences that could arise from lack of care for his genetic condition. *See*, Tenn. Code Ann. § 36-6-404(b)(16), ("[a]ny other factors deemed relevant by the court.")

The finding that Mother exposed the child to danger to his health by failing to follow the necessary dietary regimen is sufficient to support a finding that it is in the best interest of the child that Father become his Primary Residential Parent.

Mother also objects to the provision in the parenting plan that only gives her visitation with the child every other weekend, from 10:00 a.m. on Saturday to 6:00 p.m. on Sunday, as well as certain holidays. The court calculated that under that plan, Father would spend 315 days with the child each year, while Mother would only get 50 days. While this is less than the "standard visitation" described in the child support guidelines,[3] it is apparent that the purpose of the provision is to protect the child from the effects of eating too much of the wrong kinds of foods for an individual suffering from PKU.

"Trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case, and the appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation." *Reeder v. Reeder*, 375 S.W.3d 268, 278 (Tenn. Ct. App. 2012) (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999); *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001)). We are specifically instructed not to "tweak" a visitation order in the hope of achieving a more

---

[3]Under the Child Support Guidelines, standard visitation for the Alternate Residential Parent is every other weekend, Friday through Sunday, two weeks in the summer, and two weeks during the holidays, for a total of 80 days per year. Tenn. Comp. Rules & Regs. 1240-2-4-.02(7)(a).

reasonable result than the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). We do not find that the trial court abused its discretion in limiting Mother's visitation as it did.

### C. A Question of Child Support

Mother's remaining argument is that the trial court ordered her to pay child support in an amount that deviated from the presumptively correct amount calculated under the child support guidelines without specifically declaring in its order that the application of the presumptive amount would be unjust and inappropriate. Such a declaration is required before a deviation may be ordered. Tenn. Rules & Regs. 1240-2-4-.07(1)(c). Our examination of the record shows, however, that the amount of child support ordered did not deviate from the presumptive amount, so no such statement was required.

The Financial Support section of the Parenting Plan set Mother's obligation at $370 per month. The child support worksheet appended to the Plan showed that this was her presumptively correct child support obligation under the Income Shares Child Support Guidelines. Below the entry in the Parenting Plan setting out that amount, the pre-printed form states, "[i]f this is a deviation from the Child Support Guidelines, explain why:" The following language, entered below, accounts for the confusion: "The Court finds that an upward deviation is warranted due to the high costs of the special foods required of the child's medical condition and due to the fact that Father has to provide all transportation because Mother does not possess a valid driver's license."

Even though there were spaces beneath this statement to fill in an amount to be added to the presumptive obligation and a total amount of child support to be paid monthly including the additional amount, those spaces were left blank. Thus, Mother's child support obligation remained at the presumptive amount, no declaration was needed to justify any deviation, and Mother's issue is without merit.

Even if the trial court were required to explain the reasons for a deviation, the explanation on the worksheet meets the requirement of the guidelines.

### D. Attorney Fees on Appeal

Finally, Father asks this court to award him attorney fees for frivolous appeal pursuant to Tenn. Code, § 27-1-122, which states,

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may either upon

motion of a party, or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Father does not allege that Mother's appeal was taken solely for delay. He points out, however, that our courts have defined a frivolous appeal as one that is so devoid of merit that there is little prospect of it succeeding, and he contends that this is just such a appeal. *See*, *Byrnes v. Byrnes,* 390 S.W.3d 269, 279 (Tenn. Ct. App. 2012); *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) (citing *Combustion Engineering Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978)); *Industrial Development Bd. of City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995).

Our Supreme Court has cautioned, however, that "imposing a penalty for a frivolous appeal is a remedy which is to be used only in obvious cases of frivolity and should not be asserted lightly or granted unless clearly applicable – which is rare." *Henderson v. SAIA, Inc*., 318 S.W.3d 328, 342 (Tenn. 2010).

The decision to award damages for the filing of a frivolous appeal, rests within the sole discretion of the appeals court. *Banks v. St. Francis Hospital*, 697 S.W.2d 340, 343 (Tenn.1985); *Marra v. Bank of New York*, 310 S.W.3d 329, 342 (Tenn. Ct. App. 2009); *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006). Acting in the exercise of our discretion, we decline to award attorney fees in this case.

**IV.**

The judgment of the trial court is affirmed. Remand this case to the Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Marely Torres.

_____
PATRICIA J. COTTRELL, JUDGE